UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LOUISE K. SMALL,        )
                         )
        Plaintiff,    )
                         )   No.  4:06CV01459 JCH/FRB
                         )
v.                     )
                         )
                         )
MICHAEL J. ASTRUE,       )
Commissioner of Social Security,  )
                         )
        Defendant.    )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is on appeal for review of an adverse ruling by the Social Security Administration. All pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) for appropriate disposition.

**I.  Procedural Background**

This matter involves applications filed by Louise K. Small ("plaintiff") for Disability Insurance Benefits ("DIB") and Supplemental Security Income benefits ("SSI") alleging disability as of January 14, 2004 due to panic attacks and manic depression. (Tr. 157.) On August 11, 2004, plaintiff's applications were denied. (Tr. 49-53.) Plaintiff requested a hearing before an administrative law judge ("ALJ") and, on May 26, 2005, a hearing was held before ALJ Jhane

Pappenfus in Creve Coeur, Missouri.[1]  (Tr. 48; 11; 438-83.)  On October 11, 2005, ALJ Pappenfus issued her decision denying plaintiff's applications.  (Tr. 8-19.)  Plaintiff's request for review of this decision was received by defendant on December 14, 2005 and, on August 4, 2006, defendant Agency's Appeals Council denied plaintiff's request for review.[2]  (Tr. 7; 3-5.)  The ALJ's decision thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

A.  <u>Testimony of Plaintiff</u>

At the hearing on May 26, 2005, plaintiff appeared and was represented by Ms. Rachel Schwarzlose, an attorney.  Plaintiff lives alone in an apartment.  (Tr. 443.)  Plaintiff is HIV positive, having been diagnosed on April 4, 2004.  (Tr. 455.)  She graduated from high school, completed one year of college, and is certified as a Veterinary Technician.  (Tr. 443.)  Plaintiff has also undergone on-the-job training as an executive chef, which consisted of formal class work and lectures.  <u>Id.</u>  In addition, plaintiff testified that she had recently completed a semester towards an associate's degree in Horticulture, beginning August 2004 and ending in December 2004.  (Tr. 444.)  Although testimony was not adduced regarding plaintiff's age, the undersigned notes that the record indicates plaintiff's date of birth

---

[1]Following plaintiff's request for a hearing, a hearing was originally set for February 23, 2005.  (Tr. 40-43.)  Plaintiff subsequently obtained counsel and, on February 17, 2005, counsel filed a request for a continuance of the hearing date.  (Tr. 34.)  Plaintiff's hearing was subsequently rescheduled twice, for April 7, 2005 and May 26, 2005.  (Tr. 29-32; 25-28.)

[2]The Appeals Council indicated that it received and reviewed a December 14, 2005 letter from plaintiff's representative, which was made part of the record.  (Tr. 2, 6.)

as September 19, 1956.

Plaintiff has held several other jobs in the food and restaurant industry, such as cheese monger, cook, catering coordinator, bakery chef, and herb and vegetable grower. Id. Plaintiff has also worked as a warehouse worker. Id. In her capacity as a cheese monger and as a cook, plaintiff supervised and/or trained up fifteen people, and also hired and fired people. (Tr. 446.) While employed as a warehouse worker, plaintiff served as a substitute for the boss, and supervised ten other employees. Id. Plaintiff has also babysat for friends during the last fifteen years. (Tr. 450.) Plaintiff described the lifting requirements of her various jobs as ranging from 100 pounds to 10 pounds. (Tr. 447-48.)

Plaintiff testified that she once filed for workers' compensation, which she estimated settled in October of 2000. (Tr. 451.) Plaintiff further testified that, in August of 2003, she applied for unemployment compensation benefits, which terminated in February of 2004. Id. She admitted that when she applied, she had presented herself as ready, willing and able to work. Id. Plaintiff has never been imprisoned, cited for DUI or DWI, or been to detox or rehab either as an inpatient or outpatient. (Tr. 451-52.)

Plaintiff was questioned by her attorney regarding physical symptoms preventing her from working. Plaintiff testified that she suffered from peripheral neuropathy, which caused burning and tingling in her forearms, legs and feet, and which she attributed to her HIV

status and her anti-retroviral ("ARV") medication.[3]  (Tr. 452-53.) However, plaintiff testified that when she took Gabapentin,[4] she "rarely" suffered these symptoms.  Id.  Plaintiff testified that she is currently participating in a study regarding this condition with Neurologist Dr. David Clifford.  Id.  Plaintiff further testified that she suffered from "horrible weakness" everywhere on her body, and chronic fatigue, which she attributed to her HIV status.  (Tr. 454-56.)

Plaintiff testified that she had participated in a sleep study at Washington University, which revealed that plaintiff woke several times during the night.  (Tr. 456-57.)  Plaintiff testified that she had been visiting the Infectious Diseases Clinic (at Washington University) once per month, but that her visits had recently changed to once every three months.  (Tr. 458.)  Plaintiff testified that the peripheral neuropathy and weakness were the only physical conditions she had which she felt precluded all work.  (Tr. 459.) Plaintiff testified that Dr. Clifford and Dr. Overton, her physician at the Infectious Diseases Clinic, had recently discussed whether plaintiff's HIV medication could be causing her weakness and, in April of 2005, her medications were changed in an attempt to alleviate these symptoms.  Id.

---

[3]Plaintiff testified that this condition was diagnosed as part of an ongoing "Charter Study," commenced by Dr. David Clifford following plaintiff's HIV diagnosis.  (Tr. 455, 457.)

[4]Gabapentin is used to help control certain types of seizures in patients who have epilepsy. Gabapentin is also used to relieve the pain of postherpetic neuralgia (PHN; the burning, stabbing pain or aches that may last for months or years after an attack of shingles). http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a694007.html

-4-

Plaintiff's attorney questioned her regarding her mental disabilities that prevented her from working. Plaintiff testified that, since the preceding July, she had been seeing Dr. Iqubal, a psychiatrist, at intervals of once every three weeks to once every six weeks, and had also been seeing another therapist. (Tr. 461, 464.) In addition, plaintiff sees a therapist at the Women's Community Support Services facility once per week. Id. Plaintiff also attends two different HIV support group therapy sessions for a total of three group therapy sessions per month, and anticipated beginning an eight-week "healthy relationship, self-esteem group" in June. (Tr. 461-62.) Plaintiff testified that, during group therapy, she discussed issues such as self-esteem, controlling her manic-depression, and different aspects of dealing with her HIV status. (Tr. 463.)

Plaintiff testified that she had been receiving psychiatric treatment since a suicide attempt at the age of 21, and that she had been diagnosed with manic depression. (Tr. 465.) Plaintiff stated that she had been hospitalized "a little over a year ago" at Forest Park Hospital for suicidal ideation brought on by a panic attack. (Tr. 466.) Plaintiff did not actually attempt suicide at that time, and stated that she had not attempted suicide since she was 21. (Tr. 467-68.)

Plaintiff testified that she suffers from constant mood swings, and stated that her mood used to fluctuate in six month intervals between depression and mania but that, since she began taking

Lithobid,[5] her moods were less extreme. (Tr. 466-67.) Plaintiff stated that, since being diagnosed with HIV, her moods fluctuated greatly. (Tr. 467.) Plaintiff stated that her last episode of depression occurred at some point during the past year. Id. When depressed, plaintiff cries, suffers insomnia, has little energy, remains in her home for three days, feels "completely alone," and has thoughts of suicide. (Tr. 467-68.) Plaintiff testified that her depression does not affect her concentration, however, and that during the times she remains in her home for three days straight, she spends her time reading books. (Tr. 468.) Also, during the times she is depressed, plaintiff telephones the Behavior Health Response help line for emotional support. (Tr. 469.) Plaintiff also testified that she experienced a great deal of anger, directed at the man who infected her with HIV, at herself, and because of issues in her Wednesday support group. Id. Plaintiff testified that she is not physically violent, but that she does yell and scream. (Tr. 469-70.)

Plaintiff testified that, during the preceding December, she had accidentally overdosed on Lithobid, and suffered an episode of mania as a result. (Tr. 471.) Plaintiff explained that she had been prescribed a high dosage, and had to adjust it according to the season due to natural electrolyte changes occurring between winter and summer. Id. Plaintiff further explained that, when she had her medication levels checked, the overdose was noted and plaintiff was instructed to

---

[5]Lithobid, or Lithium, is used to treat episodes of mania in people with bipolar disorder.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681039.html

go to the hospital as needed, but that she just felt manic. <u>Id.</u>

Plaintiff testified regarding her history of episodes of mania. She explained that this mood caused her to talk too fast and too much, demand too much attention, and spend money "overly freely," maxing out credit cards if they were available. <u>Id.</u> Plaintiff's concentration was not affected, however, and she testified that she was an artist, and was able to do a lot of art while manic. (Tr. 472.) In fact, plaintiff testified that she once felt that she was only creative while manic, but no longer believed this to be true. <u>Id.</u>

Plaintiff testified that, when manic, she did whatever she could to keep busy, and then stated, "Now, I haven't had this problem in years." <u>Id.</u> The ALJ then asked plaintiff to limit her testimony to her alleged onset date, and plaintiff agreed. (Tr. 473.) Plaintiff then testified that she had been manic in December of 2004 due to medication overdose, and had suffered episodes of mania since her medication was adjusted. <u>Id.</u> Plaintiff had her first panic attack in January of 2004. (Tr. 474.) She testified as follows: "I had six days of severe physical and mentally debilitating panic attacks, and on the sixth day, I said to the paramedics, take me somewhere." <u>Id.</u> Plaintiff testified that she felt more stable upon leaving the hospital, but has, since then, had "the beginnings of many panic attacks." <u>Id.</u> Plaintiff further stated that she now has her medication which she takes "all the time," and has medication she takes as needed when she feels unable to help herself. <u>Id.</u>

Plaintiff described the beginning of a panic attack as "yellow pricklies" obscuring her vision, clicking in her ear, severe

heart palpitations, physical incapacity, inability to walk or use stairs, and feelings of imminent death. (Tr. 474.) Plaintiff stated that her medicine became effective fifteen to thirty minutes after ingestion. Id. She further stated that, at present, her panic attacks appeared to be more "incident provoked," whereas in January there was no apparent precipitating factor. (Tr. 474-75.) Plaintiff described precipitating incidents as rejection and other negative events, and taking antihistamines. (Tr. 475.)

Regarding her activities of daily living, plaintiff testified that she retired for the night at 11:00, and was aware of waking four times during the night. (Tr. 476.) On some mornings, she rose at 4:00 a.m., and on other mornings, she rose between 7:00 and 9:00 a.m. Id. During the day, she struggles with chronic fatigue, and naps approximately three times per week for periods of time never exceeding two hours. (Tr. 477.) She sometimes rose from naps feeling rested, but claimed that her body was still fatigued. Id. Unless she is having a panic attack, she has no trouble bathing or showering, and is able to dress every day and perform household chores such as picking up around the house, sweeping, mopping, vacuuming, and doing laundry. Id. She goes shopping, but does not drive. (Tr. 478.) She does not have a current boyfriend, but did have one in October of 2004 and, at that time, she and her boyfriend socialized with family and friends. Id. She smokes when she is able to afford cigarettes. Id. She last smoked marijuana three months prior to the hearing, and takes no other illicit drugs. Id.

Plaintiff described herself as an artist, and testified that

she intended to begin displaying her paintings, drawings, and sculptures and selling them. (Tr. 478-79.) Plaintiff testified that she had always been an artist, but only within the past year has she had enough self-esteem to begin selling her work. (Tr. 479.) Plaintiff is also interested in gardening, but is limited to container gardening because she lives in an apartment. Id. She also attempts to do as many cultural activities as possible, but can only do things that are free of charge or low cost. Id. Plaintiff takes a daily three-mile walk at a nearby park. Id.

Plaintiff testified that, at one time, she had trouble with obsessive-compulsive hair pulling, but that Fluoxetine[6] controlled this problem. (Tr. 482.) Plaintiff testified that her ARV medication was preventing the onset of AIDS. (Tr. 480.)

Plaintiff testified that she had recently completed a five-day testing process with the Division of Vocational Rehabilitation, and indicated she wanted help continuing in the horticultural program at the community college. Id.


B. Medical Records

Records from the Community Health Plus clinic of Barnes-Jewish-Christian Hospital ("BJC") Behavioral Health ("BJC Clinic") include a "semi-annual review" of plaintiff's treatment from October 2002 through April 2003. (Tr. 199.) It is indicated that plaintiff

---

[6]Fluoxetine, or Prozac, is used to control depression, obsessive-compulsive disorder, some eating disorders, and panic attacks. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a689006.html

had been seeing Dr. Khan, and that her compliance was "fair" because, although she was scheduled to see Dr. Khan monthly, she attended appointments approximately once every two to three months.  Id.  It was further noted that plaintiff had not complied with lab requests as scheduled, but reported feeling that her moods were stable and medications were effective.  Id.  Medical care for complaints unrelated to the current applications was also noted.  Id.  Finally, it is indicated that plaintiff was involved with a man who recently re-located to Memphis, Tennessee, and that she was hoping to move there as well.  (Tr. 199.)

A BJC Clinic addendum dated November 4, 2003, completed by Margaret Kastigar, M.Ed., LPC, Clinical Case Manager, indicated that plaintiff had seen Dr. Kosuri for medication services since September 2003, after having seen Dr. Khan through most of the past year.  (Tr. 191.)  Plaintiff reported difficulty keeping appointments with Dr. Khan due to transportation issues and that, despite her ability to successfully navigate the public transportation system, traveling to the appointments was too time consuming.  Id.  Plaintiff reported minimal use of alcohol and less-than-daily use of marijuana, with daily use in the past.  Id.  Plaintiff further reported great difficulty in her romantic relationships.  Id.  Plaintiff reported a desire to work, stating "I've got to get a job.  It needs to be around transportation hours & bus schedules." (Tr. 192.)  Plaintiff reported "I'm looking at the environment" instead of the job itself, and further reported contemplating two part time jobs and hoping to be hired before "the holidays" as "all hiring shuts down in January."  Id.  Plaintiff

-10-

reported a desire to make a life for herself in St. Louis, stating that she had found a church and wanted to form attachments and find "something to get involved in." Id.

Ms. Kastigar opined that plaintiff should be compliant with psychiatric medications and appointments, and with medical care. Id. Ms. Kastigar further encouraged plaintiff to obtain gainful employment, abstain from substance abuse, and participate in individual therapy to address both her problems in interpersonal relationships, and her desire to better herself. (Tr. 192.)

Records from Forest Park Hospital indicate that plaintiff was admitted to the acute inpatient psychiatric unit on January 19, 2004 with complaints of panic attack and suicidal ideation. (Tr. 168-70; 351-52.) The record indicates that plaintiff was treated with Lithobid, Paxil,[7] Xanax,[8] Lexapro,[9] and Zoloft.[10] (Tr. 168.) Plaintiff was examined by Arif Habib, M.D., who noted that plaintiff reported manic-depressive symptoms. (Tr. 170.) Plaintiff reported smoking marijuana from age 14 until September 2003, occasional alcohol use, and cocaine use "years and years ago." (Tr. 171.) It is further noted

_____

[7]Paxil, or Paroxetine, is used to treat depression, panic disorder, and social anxiety disorder.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a698032.html

[8]Xanax, or Alprazolam, is used to treat anxiety disorders and panic attacks.  http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a684001.html

[9]Lexapro, or Escitalopram, is used to treat depression and generalized anxiety disorder.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a603005.html

[10]Zoloft, or Sertraline, is used to treat depression, anxiety, and other psychological disturbances.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a697048.html

that plaintiff's family history was "noncontributory," there was no history of suicide in her family, and that plaintiff denied any history of sexual or physical abuse. (Tr. 171, 354.) Dr. Habib diagnosed Bipolar I disorder, and hypertension. Id. Plaintiff was discharged on January 30, 2004, with instructions to take Zoloft and Xanax, and to follow up for a psychiatric appointment at the BJC Clinic. (Tr. 168.)

Plaintiff presented to the BJC Behavioral Health clinic on February 18, 2004 with complaints of panic attack. (Tr. 189.) She reported being tearful that morning, feeling bad about not finding a job, stated she couldn't work if she had a panic attack, and felt fearful to be alone. Id. Plaintiff reported that she planned to attend a "relationship therapy group." Id. Plaintiff was given Seroquel,[11] and continued on Xanax and Lithobid. Id. Plaintiff next presented to the BJC Clinic On April 7, 2004 after being diagnosed with HIV, and was noted to be very upset, but coping in a positive and intelligent way. (Tr. 189.)

Records from "Personal Growth" in Creve Coeur, Missouri, consist of one page and indicate plaintiff's diagnoses of bipolar disorder, adjustment disorder, and anxiety disorder. (Tr. 202.) The record further indicates that plaintiff attended weekly one-hour supportive psychotherapy sessions as follows: twelve sessions between August 2, 2002 through December 4, 2002; eight sessions between October 2, 2003 through November 26, 2003; and eleven sessions between February

---

[11]Seroquel, or Quetiapine, is used to treat the symptoms of schizophrenia, and episodes of mania or depression in patients with bipolar disorder. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a698019.html

10, 2004 through April 28, 2004. <u>Id.</u>

Records from the Washington University Infectious Diseases Outpatient Clinic ("I.D. Clinic") indicate that plaintiff presented on May 3, 2004 after having been diagnosed as HIV positive. (Tr. 359.) This note is dictated by Iver J. Gandy, Nurse Practitioner, and also signed by William G. Powderly, M.D. (Tr. 360.) Plaintiff gave a family history of manic depression in her father and schizophrenia in her mother, and the death of her brother secondary to suicide. (Tr. 359.) Laboratory tests were ordered. (Tr. 360.)

On May 6, 2004, Judith A. McGee, Ph.D., completed a mental residual functional capacity assessment and psychiatric review technique form. (Tr. 106-22.) Dr. McGee found no marked limitations, and found that plaintiff's only "moderate" limitations involved understanding, remembering and carrying out detailed instructions, maintaining concentration, and ability to get along with co-workers and peers. (Tr. 106-08.) Dr. McGee found that plaintiff suffered from affective mood disorder/bipolar syndrome, and anxiety, and had mild restrictions in activities of daily living, and moderate restrictions in maintaining social functioning and concentration, persistence or pace. (Tr. 111-20.) Dr. McGee noted that plaintiff reported disability due to intermittent panic attacks followed by long recovery periods, and plaintiff's history of leaving a job as a manager in a wine store due to "cut backs." (Tr. 122.) Plaintiff also reported "I am very emotional. My personality is not to everyone's taste." <u>Id.</u>

On May 28, 2004, plaintiff presented to the St. Louis University Health Services Center, Wohl Memorial Institute ("Wohl

Clinic" or "SLUCare"), and a psychiatric intake evaluation was completed by Dharmeth Sheth, M.D., and Hilary Klein, M.D. (Tr. 229-30.) It was noted plaintiff had suffered from bipolar disorder for 25 years, and that she was stable on medication. (Tr. 229.) It is further noted she was unemployed with financial stressors. Id. Plaintiff gave a history of panic attacks beginning in 2004, and stated that she currently had low-level anxiety with no manic symptoms. Id. She reported having been hospitalized four times, three times while living in Minnesota. Id. She reported doing cocaine "a couple of times in February 2004," and that she currently used marijuana. (Tr. 229.) Plaintiff reported that she was a cheese monger/deli person at Straub's, and that she had been currently employed for nine years. (Tr. 230.) Plaintiff reported that she had been in a lesbian relationship for 20 years and then turned to a heterosexual relationship, had never married, and had no children. Id. She reported that, as a child, she suffered sexual and physical abuse from her mother, a schizophrenic. Id. Plaintiff further reported that her father had bipolar disorder, and that one brother had chronic mental problems and another committed suicide.[12] Id. Upon exam, plaintiff maintained good eye contact and was cooperative. (Tr. 230.) Her mood was "okay" and her affect was reactive. Id. She spoke normally, and exhibited a directed, logical thought process. Id. She denied suicidal or homicidal ideation, delusion, or phobias, her insight and

_____

[12]This history of childhood abuse and the suicide of her brother is inconsistent with the history plaintiff gave to Dr. Habib in January of 2004 when she was admitted to the psychiatric unit of Forest Park Hospital. See (Tr. 171, 354.)

judgment were fair, and she was cognitively intact.  Id.  She was diagnosed with stable bipolar affective disorder, and was found to be compliant with her medication and stable on these medications.  (Tr. 230.)  She was given Zoloft, lithium, Seroquel and Xanax.  Id.

Plaintiff returned to the I.D. Clinic on June 7, 2004 in a very tearful and stressed state, and indicated that she had just begun a new job three days ago as a food service worker at a Straub's grocery store, but that her assistant manager did not like her, and they had a recent verbal confrontation which caused plaintiff to feel stress. (Tr. 207.)  She reported being "in between psychiatrists," but that her social worker, Mike Siems, would connect her with a new psychiatrist soon.  Id.  Plaintiff was on medication for hypertension.  Id. Plaintiff complained of fatigue, and requested a multivitamin.  Id. Physical exam was normal.  (Tr. 207.)  Plaintiff was diagnosed with manic depressive illness, and was instructed to continue to take her psychiatric medication.  Id.

Plaintiff was seen at SLU Care on July 2, 2004, and it was noted that she was anxious at first, but relaxed within a few minutes. (Tr. 228.)  She reported continued marijuana use, but no use in the last two weeks because her dealer was imprisoned.  Id.  She was noted to be generally pleasant and cooperative.  Id.  Her attention was good, her speech was "mildly pressured," and her mood was "alright."  Id. Her lithium dosage was increased.  (Tr. 228.) Plaintiff returned on July 16, 2004 and reported doing well and feeling better since the lithium dosage increase.  (Tr. 226.)  She reported sleep improvement and no morning grogginess.  Id.  She reported planning to go to school

-15-

in August, and was generally pleasant and cooperative.  Id.  Her attention was good, her speech was "less pressured," and her mood was improved.  Id.

Plaintiff returned to the I.D. Clinic on July 12, 2004 for follow-up with Edgar Turner Overton, M.D.  (Tr. 272-74.)  She reported she had been doing fairly well, but had some emotional ups and downs, and reported she had been seeing Sherifa Iqbal, M.D., who had been adjusting her medications.  (Tr. 272.)  Plaintiff complained of muscle weakness  beginning in the morning, improving through the day and resolving by evening, and that this condition had persisted without worsening for several months.  Id.  Plaintiff also complained of tingling and burning in her left arm and hands, which she attributed to repetitive use, and further noted that she had recently noticed these symptoms in her bilateral feet which went away when she slept.  Id. Plaintiff further mentioned other complaints unrelated to the instant applications.  Id.  Plaintiff reported frequent marijuana use, occasional alcohol use, and crack cocaine use in March of 2004.  (Tr. 272.)  Plaintiff's physical and neurological examinations were normal, with the exception of multiple, non-infected lesions on her back and other areas, and enlarged lymph nodes.  (Tr. 273.)  It was noted she was fatigued, and that a multivitamin had not alleviated this condition.  Id.  The record includes a note from Dr. Catherine Cibulskis, a Resident in Internal Medicine, who noted that plaintiff reported "feeling well" overall.  (Tr. 274.)

On August 9, 2004, DDS Counselor Tamara Kastanas completed a physical residual functional capacity assessment.  (Tr. 98-105.)  Ms.

-16-

Kastanas determined as follows: plaintiff could occasionally and frequently lift ten pounds; stand/walk for two out of eight hours; sit for six out of eight hours; push and pull without limitation; "occasional" postural limitations due to high viral loads and low CD4 counts; and no other limitations other than avoiding exposure to extreme cold and hazards such as unprotected machinery/blades/gears due to her HIV status. (Tr. 99-102.) Ms. Kastanas found that plaintiff's statements were partially credible. (Tr. 103.)

Plaintiff returned to the I.D. Clinic on August 11, 2004 for follow-up, presenting earlier than her scheduled appointment with complaints of Atarax[13], which she had been taking for a rash, causing her to have a panic attack. (Tr. 270-71.) Physical exam was normal. (Tr. 270.) Atarax was discontinued, and plaintiff was referred to the Dermatology Clinic. (Tr. 271.) Plaintiff was given Doxepin.[14] Id.

Records from SLUCare indicate that plaintiff saw psychiatrist Dr. Iqbal on August 13, 2004. (Tr. 303.) Plaintiff reported a decrease in anger, and good support from her case manager and new friend, but that she was frustrated because her claim for disability was denied. Id. She denied side effects from medications. Id. Dr. Iqbal noted plaintiff was calm, maintained good eye contact, and maintained attention. Id. Dr. Iqbal's records further indicate an

---

[13]Atarax, or Hydroxyzine, is used to relieve the itching caused by allergies, and to control the nausea and vomiting caused by various conditions including motion sickness. It is also used for anxiety, and to treat the symptoms of alcohol withdrawal.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682866.html

[14]Doxepin is used to treat depression and anxiety.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682390.html

August 16, 2004 conversation with Nurse Gandy regarding adjustment of plaintiff's medications. (Tr. 302.) Plaintiff returned to Dr. Iqbal on September 10, 2004 and reported having enjoyed a recent visit with her father and brother. (Tr. 301.) It was noted that plaintiff had no medication side effects, that she was handling her HIV status well, and that she had begun Horticulturist school and was managing the anxiety resulting therefrom with Xanax. Id. She reported her mood as "alright." Id. Dr. Iqbal noted that plaintiff was generally pleasant and cooperative, with "good" attention and a "bright" affect. Id.

Plaintiff returned to the I.D. Clinic on September 15, 2004 with complaints related to irritable bowel syndrome, which she reported had returned "now that she is back in college working on her PhD." (Tr. 268.) Plaintiff further reported that she took a two-hour bus ride to school. Id. The note further indicates that plaintiff had a history of panic attacks, "attempted suicide by lacerating her wrists" and a 25-year history of manic depression. Id. Physical examination was normal. Id.

Plaintiff returned to Dr. Iqbal on October 11, 2004 and reported she was handling problems well and planned to start her ARV medications soon. (Tr. 300.) She reported having missed school due to diarrhea, and also complained of trichotillomania[15] which she attributed to school pressures. Id. Plaintiff's Zoloft was increased. Id.

Plaintiff presented to the BJC Clinic on October 12, 2004 for

---

[15]Trichotillomania is a type of mental illness in which people have an irresistible urge to pull out their hair. http://www.mayoclinic.com/health/trichotillomania/DS00895

annual assessment and review of her treatment plan. (Tr. 240-46.) She reported a desire to continue services in order to continue receiving medications, and monitoring of her lithium levels and her moods. (Tr. 240.) Plaintiff stated "I feel like my moods overall are more stable. My lithium levels are right. I'm working on my attitude about things." Id. She reported having filed for bankruptcy due to past due bills and debts. Id. She reported symptoms of fatigue, headache, and tingling in her hands and feet. (Tr. 241.) She reported that antihistamines gave her panic attacks. Id. Plaintiff reported that, in August of 2004, she returned to school and planned to continue. (Tr. 244.) She reported that she walked four to five days per week for exercise and relaxation, and stated that she enjoyed cooking and gardening. (Tr. 244-45.) It was recommended that plaintiff continue seeing Dr. Iqbal, and continue her medications, and that she continue her schooling in order to return to full-time employment. (Tr. 245-46.)

Plaintiff returned to the I.D. Clinic on October 25, 2004 with continued complaints related to irritable bowel syndrome. (Tr. 263.) Her rash was resolving. Id. She reported no panic attacks, but stated she was seeing Dr. Iqbal for hair pulling, and she complained of headaches. Id. The clinic note indicates that plaintiff was told she should begin taking HIV medications, but that she refused, stating she wished to wait until her semester break in December, 2004. (Tr. 264.)

Dr. Iqbal's records indicate that plaintiff did not appear for her October 25, 2004 appointment. (Tr. 299.) The records further indicate she later called the office to reschedule for November 5,

-19-

2004.  Id.

BJC Clinic notes dated May 7 through November 1, 2004 indicate that plaintiff was compliant with her treatment, was attending a support group, and was doing well on her medications, despite the notation in November that plaintiff's Zoloft dosage had to be increased to manage her trichotillomania.  (Tr. 250-54.)

On November 5, 2004, plaintiff presented to Dr. Iqbal with complaints of continued problems with hair pulling, and her Zoloft dosage was increased.  Id.  Dr. Iqbal noted plaintiff had good attention and a bright, full affect, but that she seemed stressed.  Id. Plaintiff reported that an old friend from Memphis was visiting and staying with her, and that this was "wonderful and scary all at once." (Tr. 299.)  Plaintiff called Dr. Iqbal on November 19, 2004 and reported her trichotillomania was worse than ever, and Dr. Iqbal switched plaintiff's medication to Prozac.  (Tr. 298.)

Dr. Iqbal's records include a notation of a December 1, 2004 message from plaintiff.  (Tr. 294.)  Plaintiff indicated that the BJC Clinic had advised her that her Lithium levels were elevated, but plaintiff denied side effects other than a tremor.  Id.  Plaintiff further indicated feeling overwhelmed with school and looking for a job, and with applying for financial aid.  Id.  Dr. Iqbal advised plaintiff to maintain her current Lithium dosage until her forthcoming appointment.  Id.  Plaintiff saw Dr. Iqbal on December 3, 2004 and reported that her trichotillomania had improved on Prozac.  (Tr. 297.) She reported having had a "heated interaction" with a public transportation security guard.  Id.  She reported that her sleep was

okay, and minimal side effects from medications.  <u>Id.</u>  Dr. Iqbal noted
plaintiff was generally pleasant and cooperative, maintained good eye
contact, and that she had a bright, full affect.  <u>Id.</u>  Dr. Iqbal noted
that Zyprexa[16] was to be added at plaintiff's next appointment.  (Tr.
297.)

On December 6, 2004, plaintiff presented to the I.D. Clinic
presumably to begin her ARV medications.  (Tr. 259.)  It is noted that
a September 2004 colonoscopy revealed polyps, which were removed.  <u>Id.</u>
She reported no panic attacks since the last office visit on October
25, 2004.  <u>Id.</u>  It was suggested that plaintiff begin a course of ARV
medication.  (Tr. 260.)

Plaintiff saw Dr. Iqbal on December 17, 2004 and reported
doing well and noticing an improvement with her hair pulling
compulsion.  (Tr. 296.)  Dr. Iqbal noted that plaintiff appeared "less
manicky," and that she maintained good eye contact, good attention, had
a full and bright affect, and an "okay" mood.  <u>Id.</u>  Plaintiff reported
having started a self-esteem group.  <u>Id.</u>  Plaintiff's medications were
continued and Depakote[17] was added.  <u>Id.</u>  Dr. Iqbal's records indicate
that plaintiff left a message with her office on December 30, 2004
expressing ambivalence about beginning her ARV medication, feeling

---

[16]Zyprexa, or Olanzapine, is used to treat symptoms of schizophrenia and
bipolar disorder.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601213.html

[17]Depakote, or Valproic Acid, is used alone or in combination with other
drugs to treat certain types of seizures, and to treat episodes of mania in
patients with bipolar disorder.  It is also used to prevent the onset of
migraine headaches.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682412.html

renewed shock over her diagnosis, and renewed anger at the man who infected her. (Tr. 295.) Plaintiff and Dr. Iqbal then spoke on the phone, and she and plaintiff discussed various issues. <u>Id.</u> Dr. Iqbal's note indicates that plaintiff "seemed relieved just to talk to me." <u>Id.</u> On January 14, 2005, plaintiff presented to Dr. Iqbal with continued complaints of ambivalence over beginning her ARV medication, and of hair pulling. (Tr. 293.) She denied side effects from medications. <u>Id.</u> Dr. Iqbal noted plaintiff was generally pleasant and cooperative, with good eye contact, good mood and attention. <u>Id.</u> Plaintiff's Prozac dosage was increased. <u>Id.</u>

Plaintiff returned to the I.D. Clinic for follow-up on January 24, 2005, at which time it was noted she had not begun her ARV medication as recommended during her December visit due to anxiety. (Tr. 257.) Plaintiff expressed her intent to begin her medication and advise the Clinic of this via telephone. (Tr. 258.)

Plaintiff saw Dr. Iqbal again on February 18, 2005 and reported feeling manic over the past week; however, Dr. Iqbal noted that plaintiff appeared "much less so." (Tr. 292.) Plaintiff reported tolerating her ARV medications. <u>Id.</u> Dr. Iqbal noted plaintiff maintained good eye contact, and exhibited a good mood with a full, bright affect. <u>Id.</u> Plaintiff's Prozac and Depakote were increased. <u>Id.</u>

Dr. Iqbal subsequently prepared a Mental Medical Source Statement which she signed on February 25, 2005. (Tr. 231-34.) Therein, Dr. Iqbal indicated that plaintiff had marked limitations in

her ability to behave in an emotionally stable manner, interact with the public, maintain socially acceptable behavior and handle criticism. (Tr. 231-32.) She further indicated that plaintiff was markedly limited in her ability to understand and remember simple instructions, complete a normal workday/workweek, maintain attention, perform at a consistent pace, and respond to changes in a work setting. (Tr. 232.) Other moderate restrictions were also noted. (Tr. 231-34.) Dr. Iqbal opined that plaintiff had experienced "one or two" episodes of decompensation since beginning treatment in July of 2004, and that plaintiff had suffered a substantial loss of her ability to respond appropriately to people in a work setting, and to deal with changes in the workplace. (Tr. 233.) She opined that plaintiff's condition could be expected to last for twelve continuous months, but indicated that she was unsure whether the condition had persisted for the preceding twelve months because "I have not seen her for 12 months." Id. Dr. Iqbal diagnosed plaintiff with bipolar affective disorder I, and assigned a GAF of 60. (Tr. 234.)

Plaintiff returned to the I.D. Clinic on February 28, 2005 and was seen by Dr. Overton with complaints of chronic diarrhea. (Tr. 307.) She reported 100% compliance with her medications, and reported that she tolerated them well after about ten days of fatigue. Id. Plaintiff reported feeling more relaxed, and reported mild paresthesia mainly of her left hand. Id.

On March 9, 2005, Nurse Gandy completed a physical medical source statement. (Tr. 236-39.) Nurse Gandy indicated that plaintiff could sit, stand or walk for one hour out of eight, and occasionally

lift and carry five pounds, but that she was limited in her ability to balance, even when standing or walking on level terrain. (Tr. 236-38.) She opined that plaintiff was able to occasionally reach over her head and stoop, and could tolerate occasional exposure to noise, but that she should never be exposed to odors or dust. Id. Nurse Gandy opined that plaintiff did not have a medically determinable impairment that could be expected to produce pain. Id. She opined that plaintiff required occasional naps, and would need to take more than three breaks during an eight-hour workday, as her behavior ranged from fatigued to manic. (Tr. 239.) Nurse Gandy opined that these limitations could be expected to last 12 continuous months, and that they had existed as of May 3, 2004. Id. Following Nurse Gandy's signature at the end of the form is the following notation: "for Dr. Turner Overton Edgar D. Overton." Id.

Plaintiff returned to the I.D. Clinic on April 4, 2005 and reported tolerating her therapy well and having no panic attacks since her last visit. Id. She was noted to be stable and improving. (Tr. 311.) Plaintiff returned on April 13, 2005 with complaints of increased fatigue, muscle weakness, headaches, pain in both legs muscle pain in her chest, and a burning sensation in both feet. (Tr. 312.) It was noted that her Depakote tablets had recently been changed to Depakote EC, which she was tolerating well. Id. Laboratory tests were ordered to assess plaintiff's complaints. (Tr. 314.) On April 21, 2005, plaintiff presented to the I.D. Clinic with complaints of increased fatigue, muscle weakness, headaches, pain in both legs, muscle pain in her chest, and burning sensations in her feet. (Tr.

-24-

315.) It was noted that the cause of her symptoms was unknown, but plaintiff's prior laboratory tests revealed elevated lactic acid levels, and repeat labs were ordered. (Tr. 316.)

Records from the Washington University Medical School, department of Neurology, indicate that plaintiff was seen by Dr. Clifford on April 25, 2005 with complaints of burning pain, itching and swelling in her feet and hands which began the preceding July, lasted for three weeks, and disappeared. (Tr. 304.) Plaintiff stated that she now had intermittent complaints of burning, itching, tingling as if on fire, but full of needles, on the bottoms of her feet, which impaired walking. Id. She reported that the symptoms were worse at night, and that the sense of numbness "has happened on and off whole life." Id. Plaintiff had no symptoms of burning in her hands, but some tingling. Id. She reported exercising and walking less than she had before. (Tr. 304.) She reported taking Lithium and Depakote. Id. Plaintiff reported that she had stopped attending college for Horticulture because of problems with financial aid, but that she planned to return. Id. On exam, plaintiff was alert, with normal attention, speech, language, intellect and judgment. (Tr. 305.) Her affect was "predominantly sad and tearful and anxious. It was inappropriate to content." Id. Physical and neurological exam were essentially normal. Id. Dr. Clifford diagnosed peripheral neuropathy, and questioned whether plaintiff's ARV medication might be triggering her pain, indicating he intended to speak to Dr. Overton regarding this issue. Id. Dr. Clifford noted that other typical causes of peripheral

neuropathy were absent, and suspected that swelling in plaintiff's feet may be another factor. (Tr. 305.) Dr. Clifford prescribed Gabapentin, and noted that the "actual degree of negative signs on exam is relatively modest, and reflexes are well preserved." Id.

On June 8, 2005, plaintiff presented to the emergency room of Forest Park Hospital in a manic state, reporting suicidal and homicidal ideation. (Tr. 378, 380.) She was treated by Dr. Habib, who noted that plaintiff reported a history of occasional auditory and visual hallucinations, suicidal ideation with no plan, anger at her friends, and thoughts of hurting them. (Tr. 380.) Dr. Habib noted as follows: "She denies using any drugs and alcohol to me. Her drug screening is positive for marijuana and benzodiazepine." Id.[18] Plaintiff denied any history of sexual or physical abuse. (Tr. 381.) She had fair eye contact, and denied current auditory/visual hallucinations. Id. Her mood was angry and her affect was unstable. Id. She was admitted to the closed psychiatric unit for observation and treatment. Id.

The nursing and social worker notes indicate that plaintiff reported a history of physical, emotional and sexual abuse from her mother, and further reported that her brother committed suicide in 1970. (Tr. 386, 388, 395.) Plaintiff further indicated suffering a manic episode, having relationship problems, stated "I hate men," and complained of poor sleep. (Tr. 387.) The records indicate that plaintiff improved with treatment, and was discharged on June 13,

_____

[18]Benzodiazepine is found in Valium and Xanax.
http://www.emedicinehealth.com/benzodiazepine_abuse/article_em.htm

2005.  (Tr. 383-90.)

    C.  <u>Vocational Rehabilitation Evidence</u>

        The record indicates that plaintiff has received assistance
from the Vocational Rehabilitation Division of Missouri's Department of
Education.  (Tr. 331-49.)  On July 20, 2004, plaintiff completed a
Function Report.  (Tr. 132-44.)  In Section B, plaintiff described her
typical day as follows: "Shower and other personal care, get up, drink
coffee or tea, watch news, eat breakfast, take meds, do errands -
grocery shopping, make and return phone calls, go to appointments with
therapist, psychiatrist, doctors, walk at least two miles daily, eat
lunch, go to library once a week, relaxation exercises daily, go to
church once a week, go to HIV support group once a week, take nap, make
dinner and eat, talk with friends, watch TV, read, work on art, take
meds, sleep." (Tr. 132.)  Plaintiff indicated that she ate sandwiches
for lunch, and "made from scratch" dinners, went outside daily, and had
significant hobbies and interests, including reading, creating art, and
caring for plants.  (Tr. 134-36.)  Plaintiff reported that she talked
on the telephone "a lot," and that, on a weekly basis, she went to free
or inexpensive shows and concerts, went to the zoo and/or botanical
garden, and attended church weekly.  (Tr. 136.)  Plaintiff reported
difficulty maintaining concentration and attention, and following
spoken instructions.  (Tr. 137.)  Plaintiff indicated her desire to go
back to school and earn a degree in horticulture so that she may begin
another field before turning fifty years of age, and also indicated
that she was unable to work in her "chosen field" due to high stress

and the dangers of exposing herself to bacteria and mold found in artisan cheese. (Tr. 133, 139.) In addition, plaintiff indicated that she was not currently working, but was looking for work. (Tr. 140.) She indicated she went to the library weekly, and read various materials with no difficulty. (Tr. 143.) The record also includes various email communications between vocational rehabilitation counselors, one of which indicated that plaintiff was "not doing well over-all" and was suffering from mood swings. (Tr. 339.)

III.     **The ALJ's Decision**

The ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset of disability, and that, although she had the "severe" impairments of affective mood disorder, HIV positive status, and poly-substance abuse, these medically-determinable impairments were not of listing-level severity. (Tr. 18.) Regarding plaintiff's HIV status, the ALJ found that, although plaintiff was HIV positive, she did not have AIDS, and therefore did not meet the requirements of Listing 14.08. (Tr. 13.) The ALJ noted that plaintiff's chronic drug abuse was not a contributing factor material to the determination of her claim for disability, as the record demonstrated that plaintiff was consistently able to perform work and work-like activities regardless of whether she was abusing drugs. (Tr. 13, 19.)

The ALJ analyzed and discredited plaintiff's subjective complaints of symptoms and limitations precluding all work. (Tr. 18.)

For her credibility analysis, the ALJ cited <u>Polaski v. Heckler</u>, 739 F.2d 1320 (8th Cir. 1984), listed the relevant factors therefrom, and specifically stated that she had considered all factors in analyzing plaintiff's credibility. (Tr. 13.) The ALJ noted that no physician had stated that plaintiff was disabled or unable to work, and wrote: "A record which contains no physician opinion of disability detracts from the claimant's subjective complaints. <u>Edwards v. Secretary of Health and Human Service</u>, 809 F.2d 506, 508 (8th Cir. 1987); and <u>Fitzsimmons v. Mathews</u>, 647 F.2d 862, 863 (8th Cir. 1981)." (Tr. 13.) The ALJ also noted plaintiff's repeated statements to her treatment providers that she wanted to work and was actively seeking work, having submitted applications for employment since her alleged disability onset date. (Tr. 13-14.) The ALJ also noted plaintiff's testimony and the evidence in the record regarding her extensive activities of daily living, noting that she was fully functional in self-care, and that she regularly engaged in physical exercise and social and cultural activities, and concluded that such activities were inconsistent with allegations of symptoms precluding all work. <u>Id.</u> The ALJ further noted that plaintiff had collected unemployment benefits from August 2003 until at least February 2004. (Tr. 14.)

The ALJ also noted that, on July 23, 2004, plaintiff reported in a telephone conversation to an Agency representative that she did not apply for disability based on her HIV status, but due to panic attacks. (Tr. 14.) The ALJ further noted that plaintiff indicated that she stopped working on August 6, 2003 because she was let go from

her job due to cost-cutting measures, and not due to inability to perform the work. (Tr. 12.) Also noted was plaintiff's testimony that she wished to return to school to complete her degree in horticulture and begin a new career before reaching fifty years of age. (Tr. 14.)

The ALJ found that functional limitations precluding all work were not reflected by the medical evidence of record. (Tr. 14.) The ALJ extensively discussed the medical evidence, and noted that, although plaintiff indeed had bipolar disorder type I, the mere existence of a mental condition was not per se disabling. (Tr. 16-17.) The ALJ wrote "Where a claimant's mental or emotional problems do not result in a marked restriction of daily activities, constriction of interests, deterioration of personal habits, or an impaired ability to relate, they are not disabling. (See, Gavin v. Heckler, 811 F.2d 1195, 1198 (8th Cir. 1987))." (Tr. 17.) The ALJ found no credible evidence that plaintiff had more than a slight restriction of daily activities and that, while she may well have had some brief periods of severe symptoms, there was no evidence to suggest debilitating symptoms continuously for twelve months. Id. The ALJ also noted evidence that plaintiff was non-compliant with medication and keeping doctors appointments, a finding incompatible with disability precluding all work. Id.

The ALJ found that plaintiff retained the residual functional capacity ("RFC") to perform a wide range of medium work, which required maximum lifting of 50 pounds, frequent lifting of 25 pounds, and

standing/walking for six out of eight hours.  (Tr. 18-19.)  The ALJ
found that plaintiff should avoid contact with the public and working
with dangerous machinery.  (Tr. 19.)  Based on this finding, the ALJ
concluded that plaintiff retained the residual functional capacity to
perform her past relevant work as a cook, baker, and warehouse worker,
and concluded that plaintiff was not under a "disability" as defined in
the Act.  Id.


## IV.  Discussion

To be eligible for Social Security disability benefits and
Supplemental Security Income under the Social Security Act, a plaintiff
must prove that he is disabled.  Pearsall v. Massanari, 274 F.3d 1211,
1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Services,
955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines
"disability" in terms of the effect a physical or mental impairment has
on a person's ability to function in the workplace.  It provides
disability benefits only to persons who are unable to "engage in any
substantial gainful activity by reason of any medically determinable
physical or mental impairment which can be expected to result in death
or which has lasted or can be expected to last for a continuous period
of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A),
1382c(a)(3)(A).  It further specifies that a person must "not only [be]
unable to do his previous work but [must be unable], considering his
age, education, and work experience, [to] engage in any other kind of
substantial gainful work which exists in the national economy,

-31-

regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A); Bowen v. Yuckert, 482 U.S. 137, 140 (1987); Heckler v. Campbell, 461 U.S. 458, 459-460 (1983).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen, 482 U.S. at 140-42. The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform his or her past relevant work. If so, the claimant is not disabled. If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform. Pearsall, 274 F.3d at 1217, Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000). Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Young o/b/o Trice v. Shalala, 52 F.3d 200 (8th Cir. 1995), citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion. Briggs v. Callahan, 139 F.3d 606, 608 (8th Cir. 1998). To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ;

2. The plaintiff's vocational factors;

3. The medical evidence from treating and consulting physicians;

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5. Any corroboration by third parties of the plaintiff's impairments;

6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the plaintiff's impairment.

Stewart v. Secretary of Health & Human Services, 957 F.2d 581, 585-86 (8th Cir. 1992), quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings." Groeper v. Sullivan, 932 F.2d 1234,

1237 (8th Cir. 1991); see also Briggs, 139 F.3d at 608. However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Briggs, 139 F.3d at 608; Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992), citing Cruse, 867 F.2d at 1184.

In the case at bar, plaintiff argues that the ALJ's RFC determination was in error because it was not supported by medical evidence. Plaintiff further contends that the ALJ improperly weighed the opinions of plaintiff's treating physicians, and failed to conduct the proper analysis before discrediting them.[19] Plaintiff also contends that the ALJ placed too much weight both upon plaintiff's GAF score of 60, and upon the opinion of the non-examining state psychologist, thus failing to fully and fairly develop the record. In response, the Commissioner argues that substantial evidence supports the ALJ's decision.

A. Residual Functional Capacity Determination

In this case, the ALJ noted that plaintiff had the medically determinable impairments of affective mood disorder, HIV+ status, and poly-substance abuse, but that the record did not support a finding that these conditions precluded her from working. The ALJ concluded that plaintiff retained the residual functional capacity to perform her

---

[19]The opinions plaintiff notes were improperly weighed/considered were Nurse Gandy's Physical Medical Source statement (which plaintiff notes was signed on behalf of Dr. Overton), and the "marked limitations" identified by Dr. Iqbal.

past relevant work as a cook, baker, and warehouse worker. Plaintiff argues that this determination was not based upon or supported by medical evidence. The undersigned disagrees.

Residual functional capacity is what a claimant can do despite her limitations. 20 C.F.R. § 404.1545, Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); 20 C.F.R. §§ 404.1545(a), 416.945(a). A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination. Id.; Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer, 245 F.3d at 703-04; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Hutsell, 259 F.3d at 712. However, although an ALJ must determine the claimant's RFC based upon all of the relevant, credible evidence of record, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. Pearsall, 274 F.3d at 1217 (8th Cir. 2001); McKinney, 228 F.3d at 863. The claimant bears the burden of establishing her RFC. Goff, 421 F.3d at 790.

For her RFC determination, the ALJ extensively analyzed all

of the relevant, credible evidence in the record, including the medical records, the observations of treating physicians and others, and plaintiff's own description of her symptoms and limitations. The ALJ properly noted that no physician had stated that plaintiff's condition precluded all work. See Johnson v. Chater, 87 F.3d 1015, 1017-18 (8th Cir. 1996) (it is proper for an ALJ to consider the lack of reliable medical opinions to support a claimant's allegations of a totally disabling condition; in fact, this was noted to be the "strongest support" in the record for the ALJ's determination); Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (lack of significant medical restrictions imposed by treating physicians supported ALJ's decision denying benefits); Cruse, 867 F.2d at 1186 (the lack of objective medical evidence to support the degree of severity of alleged pain is a factor to be considered). The ALJ also noted that, in October 2003, plaintiff was noted to have a GAF of 70, indicating the treatment provider's opinion that plaintiff had only some mild symptoms. The ALJ noted plaintiff's history of noncompliance and sporadic attendance at doctor's appointments. See Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997) (functional limitations are inconsistent with failure to obtain regular medical treatment). Also noted were plaintiff's two hospitalizations at Forest Park Hospital, and her improvement and discharge to home following receipt of treatment and medication.

The ALJ discussed plaintiff's course of treatment at the I.D. Clinic, noting that plaintiff often reported doing fairly well, and further noting that plaintiff initially refused to take her ARV

medications as instructed, but that later, when she started them, they effectively managed her condition and caused no side effects.

The ALJ also noted plaintiff's treatment with Dr. Clifford for her alleged peripheral neuropathy, and that Dr. Clifford treated plaintiff symptomatically with Gabapentin, which controlled her symptoms. The undersigned notes that plaintiff testified that her ARV medication is still preventing the onset of AIDS, and further testified that she rarely experienced symptoms attributable to peripheral neuropathy as long as she took Gabapentin, and that her trichotillomania was also controlled with medication. In sum, the medical records and plaintiff's own testimony consistently support the conclusion that plaintiff's physical and mental impairments are controlled with medication. Impairments which can be controlled with medication or treatment are not considered disabling. Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004); see also Hutton v. Apfel, 175 F.3d 651, 654 (8th Cir. 1999) (Impairments which are controllable or amenable to treatment do not sustain a finding of total disability). Regarding plaintiff's allegations of disabling fatigue, the undersigned notes the absence of documentation in the medical records that plaintiff routinely complained of debilitating fatigue during her various appointments. See Stephens v. Shalala, 46 F.3d 37, 38 (8th Cir. 1995) (per curiam) (discrediting later allegations of back pain when no complaints made about such pain while receiving other treatment.)

The ALJ further noted that the physicians at the I.D. Clinic

neither undertook nor recommended any intervention other than continued ARV therapy and monitoring of her condition. Conservative or minimal medical treatment militates against a finding of disability. Loving v. Department of Health and Human Services, Secretary, 16 F.3d 967, 970 (8th Cir. 1994). The ALJ noted plaintiff's evaluation in May 2004 with Drs. Sheth and Klein, during which plaintiff reported compliance with medications, no depressive or manic symptoms, and that plaintiff was deemed "stable" following evaluation. The ALJ further noted plaintiff's psycho-social assessment at BJC in October of 2004, during which plaintiff reported that her moods were overall more stable.

The ALJ further noted other evidence from the record militating against a finding of disability. The ALJ noted that plaintiff was contemplating work, and was in fact seeking work during the time period relative to her applications for disability. Searching for work contradicts a claimant's allegations of disability precluding all work. Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995); Mitchell v. Sullivan, 907 F.2d 843, 844 (8th Cir. 1990). The ALJ also noted that plaintiff had applied for unemployment compensation, and testified that, when she did so, she indeed held herself out as ready, willing and able to work. Applying for unemployment compensation is evidence negating a plaintiff's claim that she is disabled. Black v. Apfel, 143 F.3d 383, 387 (8th Cir. 1998); Johnson v. Chater, 108 F.3d 178, 180 (8th Cir. 1997); Jernigan v. Sullivan, 948 F.2d 1070, 1074 (8th Cir. 1991). Furthermore, the ALJ noted that the record included evidence that plaintiff was let go from prior employment due to cost-

-38-

cutting measures, not due to her inability to perform her work. The Eighth Circuit has found it significant when a plaintiff leaves work for reasons other than disability. Goff, 421 F.3d at 793 (claimant stopped working after being fired for slapping a patient, not because of her disability); Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) (claimant left his job because the job ended; therefore, not unreasonable for the ALJ to find that this suggested that his impairments were not as severe as he alleged); Weber v. Barnhart, 348 F.3d 723, 725 (8th Cir. 2003) (Noting that claimant testified that she left her bathroom attendant job due to a lack of transportation, not due to disability.) Finally, the ALJ noted that plaintiff was not honest with her physicians regarding her drug use, having denied such use to Dr. Habib on June 8, 2005, despite a drug screen found to be positive for marijuana and benzodiazepine. (Tr. 380-82; 388.) Similarly, the undersigned notes that plaintiff was also apparently dishonest with Dr. Habib regarding her history of abuse, denying a history of physical or sexual abuse to him while reporting a history of such abuse to other care givers. (Tr. 381; 386, 388, 395.)

In addition, although plaintiff herein does not challenge the ALJ's credibility determination, the undersigned notes that the ALJ properly discredited plaintiff's allegations of symptoms precluding all work after undertaking the proper analysis. The ALJ cited Polaski and the relevant factors therefrom, and specifically stated that she had considered them in making her credibility determination. The ALJ then set forth numerous factors detracting from plaintiff's credibility, and

discredited plaintiff's allegations of symptoms precluding all work. The ALJ's analysis was sufficient.

A review of the administrative record and the ALJ's decision reveals that she properly exercised her discretion and acted within her statutory authority in evaluating the medical evidence and the other credible evidence of record. The undersigned concludes that the ALJ's RFC determination is supported by substantial evidence on the record as a whole.

B. Opinions of Dr. Iqbal and Nurse Gandy/Dr. Overton

In addition, the ALJ discussed the reports of Dr. Iqbal and Nurse Gandy which, as noted supra, indicated some significant functional limitations. The ALJ discussed these opinions in light of her evaluation of the record as a whole, and concluded that they were entitled to only nominal weight. Plaintiff contends that the ALJ failed to properly weigh these opinions, and that she improperly discredited them. More specifically, regarding Dr. Iqbal's report, plaintiff contends that the ALJ placed too much emphasis on plaintiff's 60 GAF score. Regarding Nurse Gandy's report, plaintiff contends that, while Nurse Gandy herself is not an "acceptable medical source" under the Regulations, she signed the form on Dr. Overton's behalf, and the opinions expressed therein can therefore be attributed to him. A review of the record shows that the ALJ properly discredited this opinion evidence after undertaking the proper analysis.

The opinion of a treating physician is accorded special deference under the social security regulations. See Singh v. Apfel,

222 F.3d 448, 452 (8th Cir. 2000).  The regulations provide that a treating physician's opinion regarding an applicant's impairment will be granted "controlling weight," provided the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. § 404.1527(d)(2).  Consistent with the regulations, the Eighth Circuit has stated that a treating physician's opinion is "normally entitled to great weight," Rankin v. Apfel, 195 F.3d 427, 430 (8th Cir. 1999), but has also cautioned that such an opinion "do[es] not automatically control, since the record must be evaluated as a whole." Bentley, 52 F.3d at 785-86.

An ALJ may permissibly discount or even disregard the opinion of a treating physician where other medical assessments "are supported by better or more thorough medical evidence," Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997), or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions, see Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996).  Again, as the Eighth Circuit has noted, "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as whole."  Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).  Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must "always give good reasons" for the particular weight given to a treating physician's evaluation.  20 C.F.R. § 404.1527(d)(2); Prosch v. Apfel, 201 F.3d

1010, 1012-13 (8th Cir. 2000).

The ALJ properly discredited Dr. Iqbal's report after noting internal inconsistency. The ALJ did not, as plaintiff contends, place improper emphasis on Dr. Iqbal's notation that plaintiff's GAF score was 60. The ALJ merely considered the meaning of this score and noted that it indicated only moderate limitations, and was therefore inconsistent with the remainder of Dr. Iqbal's report assessing more severe limitations. This is consistent with Eighth Circuit precedent. Having noted such an inconsistency in Dr. Iqbal's report, the ALJ was not compelled to give it controlling weight. Goff, 421 F.3d at 791 (treating physician's opinion that claimant had a GAF of 58 was inconsistent with his opinion that claimant suffered extreme limitations, and the ALJ was therefore not compelled to give controlling weight to the opinion; GAF of 51 to 60 indicated only moderate symptoms.)

The ALJ also gave little weight to the opinion of Nurse Gandy/Dr. Overton, noting both internal inconsistency and inconsistency with the balance of the medical evidence and longitudinal history. The ALJ noted that, although Nurse Gandy/Dr. Overton's report stated that plaintiff did not have a medically determinable impairment that could be expected to produce pain, it was concluded that plaintiff had significant lifting restrictions, and required naps and many breaks during the course of an eight-hour work day. The ALJ further noted that the report was inconsistent with the other medical evidence of record, which did not support the conclusion

that plaintiff was limited to such an extent. In the course of her
analysis, the ALJ indeed indicated that she was also discrediting the
report because it was apparently produced by a nurse, and as such was
not from an "acceptable medical source" per the Regulations. Indeed,
as the Commissioner correctly notes, a nurse is not an "acceptable
medical source," but is an important "other" medical source of
information which the ALJ must consider. 20 C.F.R. § 404.1513(a);
Shontos v. Barnhart, 328 F.3d 418, 426 (8th Cir. 2003). However, the
undersigned notes that the report's apparent author was only one
reason the ALJ gave for discrediting it, and sees no utility in
speculating whether the opinions expressed in the report were indeed
those of Dr. Overton.          In          In this case, the ALJ indeed
gave "good reasons" for the particular weight she assigned to the
medical opinions at issue. See Prosch, 201 F.3d at 1012-13. The
noted inconsistencies, both within the reports themselves and between
the reports and the balance of the medical evidence of record, are
adequate reasons for discrediting them. See Hogan, 239 F.3d at 961;
Prosch, 201 F.3d at 1013 (ALJ may discount or disregard a treating
physician's opinion if that physician offers inconsistent opinions);
Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996) (ALJ properly
discredited opinion of treating physician who rendered inconsistent
opinions, finding that such inconsistency undermined the physician's
credibility).


C.    Fully and Fairly Develop the Record

Plaintiff argues that the ALJ failed to fully and fairly develop the record, inasmuch as she relied too heavily upon plaintiff's GAF score and placed improper emphasis on the opinion of the non-examining state psychologist. The undersigned disagrees.

It is well-settled law that the ALJ is required to ensure a fully and fairly developed record. Nevland, 204 F.3d 853 (citing Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983)). Included in this duty is the responsibility of ensuring that the record contains evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue. Nevland, 204 F.3d at 858; see Strongson v. Barnhart, 361 F.3d 1066, 1071-72 (8th Cir. 2004). A reviewing court has the duty of determining whether the record presents medical evidence of the claimant's RFC at the time of the hearing. Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995). Unless the record contains such evidence, the ALJ's decision cannot be said to be supported by substantial evidence. Id.

In this case, the ALJ fulfilled her duty to ensure a fully and fairly developed record. As discussed above, review of the ALJ's disability determination and her RFC findings reveal that she properly exercised her discretion and acted within her statutory authority in evaluating the evidence on the record as a whole. As discussed, the ALJ did not err in either her analysis of plaintiff's GAF score or in her treatment of the opinion evidence, and her disability determination and RFC findings are supported by substantial evidence on the record as a whole. Because there is substantial evidence to

support the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence may support a different outcome, or because another court could have decided the case differently. <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001); <u>Browning</u>, 958 F.2d at 821.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be affirmed, and that plaintiff's Complaint be dismissed with prejudice.

The parties are advised that they have until February 7, 2008 to file written objections to this Report and Recommendation. Failure to timely file objections may result in waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

_Frederick R. Buckles_

UNITED STATES MAGISTRATE JUDGE

Dated this 24th day of January, 2008.